**BETTCHER INDUSTRIES, INC., Plaintiff,**

v.

**BUNZL USA, INC., et al., Defendants.**

Case No. 3:08 CV 2423.

United States District Court,
N.D. Ohio,
Western Division.

Feb. 26, 2010.

Christina J. Moser, David E. Kitchen, Thomas H. Shunk, Baker & Hostetler, C. George L. Pinchak, Tarolli, Sundheim, Covell & Tummino, Cleveland, OH, for Plaintiff.

Alan H. Norman, Jason M. Schwent, Nicholas J. Lamb, Thompson & Coburn, St. Louis, MO, Forrest A. Norman, III, George H. Carr, Gallagher Sharp, Cleveland, OH, for Defendants.

## MEMORANDUM OPINION AND ORDER

JACK ZOUHARY, District Judge.

### INTRODUCTION

Pending before this Court is Plaintiff Bettcher Industries, Inc.'s ("Bettcher") Motion for Preliminary Injunction (Doc. No. 36). The Motion has been fully briefed (Doc. Nos. 36, 74, 81, & 109). An evidentiary hearing was held (Doc. Nos. 95 & 110) and post-hearing briefs filed (Doc. Nos. 121 & 122). Bettcher asks this Court to preliminarily enjoin Defendants, and all those acting in concert with them, from making, using, selling, or offering for sale in the United States certain models of rotary blades designated "M2 Replacement Blades."

### BACKGROUND

#### Parties

Plaintiff Bettcher is a Delaware corporation with its principal place of business in Birmingham, Ohio. It manufactures and sells food processing equipment and hand tools, including trimming knives. Its products are used for various applications in the meat processing industry. Bettcher currently sells Whizard® rotary trimming knives and accessories, including the Series II products. Bettcher sells its products directly to end users through its sales network (TR 267–69). Bettcher rotary trimming knives come in various sizes, and accordingly there are replacement blades of various sizes that fit each of the knives. The blades designated as "Series II" blades vary as to diameter, shape and angle of the cutting surface.

Defendant Bunzl USA, Inc. is a Delaware corporation with its principle place of business in St. Louis, Missouri. Defen-dant Bunzl Processor Distribution, LLC is a Missouri limited liability corporation with its principal place of business in Kansas City, Missouri. Defendants are affiliated companies (together "Bunzl") that provide a variety of products for the food processing and supermarket industries.

Bunzl sells replacement rotary knife blades for use in Bettcher's Series II Knives. These blades are manufactured by Exact.[1] Exact does not manufacture, nor does Bunzl sell, a rotary knife (PX 7, 40, 41, 80). Bunzl's blades are marketed as "replacement trimmer blades" and Bunzl uses the same numbering system for its replacement blades as Bettcher does for the original blades (PX 40).

#### 325 Patent

On February 21, 2006, the United States Patent & Trademark Office ("Patent Office") issued United States Patent 7,000,-325 for a "Low Friction Rotary Knife," naming Jeffrey Whited ("Whited") as the inventor ("325 patent") (PX 2; DX 63). Whited is an employee of Bettcher. The 325 Patent was assigned to, and is currently owned by, Bettcher (Rapp Declaration, Doc. No. 36–2, ¶ 8).

The 325 Patent is the result of extensive engineering work by Whited, which began in 1996 at Bettcher and which led to the development of a new rotary knife for the meat processing industry referred to as the "Whizard® Trimmer Series II" knife ("Series II Knife"). Among the innovative features of the Series II Knife was a special, replaceable rotary blade, engineered with a unique "bearing race" that allowed it to function at extremely high rotational speeds in a failure-free manner (PX 2; TR 219–24). A photograph of a Series II Knife, including the blade, appears below (Doc. No. 36–1, p. 5):

---

1. Exact Manufacturing & Machine, Inc., d/b/a TKM Company ("Exact") is a Nebraska corporation with its principal place of business in Omaha, Nebraska. Exact is owned and managed by Scott Allison and Kurt Huetter. Exact was dismissed without prejudice from this action prior to the hearing on the Motion for Preliminary Injunction.

The 325 Patent is directed to the rotating, annular blade portion that is a replaceable component of the knife. The blade (depicted as sitting inside the blade support structure) is shown below in cross-section in Fig. 9 from the 325 Patent:

Fig.9

Bettcher blades, having a bearing race as depicted above, are covered by at least Claim 1 of the 325 Patent. The key cross-sectional element of the blade is shaded. The cross-sectional shape of the bearing race 66 is described in the 325 specification as comprising "first and second bearing surfaces 70, 72 that converge proceeding toward each other ... [and that are] frustoconical" (325 Patent, col. 5, ll. 19–26).

For purposes of the preliminary injunction, Bettcher has focused on Claim 1 of the 325 Patent (PX 2):

A rotary knife blade comprising: a rotatable annular body defining first and second axial ends, said body disposed about a central axis; and, an annular blade section rotatable with the annular body and projecting axially from the first axial end of said body; said body comprised of a wall defining a radially outer surface disposed between said first and second axial ends, and an annular bearing race in said surface and extending radially into said wall, said bearing race spaced axially from said blade section and comprising a first surface that converges proceeding away from said second axial end, and a second surface that converges proceeding toward said first surface, said first and second surfaces defining first and second bearing faces spaced axially apart, wherein both of said bearing faces are frustoconical.

It is uncontested that the accused Bunzl blades fit into Bettcher Series II Knife handles and are identical in shape and dimension to the Bettcher knives *except for* the cross-sectional shape of the bearing race of the blade. The accused Bunzl

blades, as manufactured, have a semicircular bearing race cross section (PX 41). It is also uncontested that there is no use for the accused Bunzl blades other than to fit into and be used in the corresponding Bettcher Series II Knife handle. Thus, every customer for a Bunzl "replacement trimmer blade" is an entity that at one time purchased a complete Bettcher rotary knife, including a Bettcher rotary blade, and then has purchased a replacement blade for that rotary knife from Bunzl (Rapp Declaration, ¶ 16).

Bettcher contends that when its customers purchase a Bunzl replacement trimmer blade and use that blade in the ordinary course of business, the bearing race of the blade quickly wears to a shape as described in Claim 1 of the 325 Patent. Bettcher further contends that by advertising the replacement trimmer blades for use with the Bettcher knife, and with actual knowledge of Bettcher's claim regarding the blade wear pattern, Bunzl both contributes to its customers' direct infringement of the 325 Patent, and also induces that direct infringement.

Initially, Bettcher's Motion for Preliminary Injunction accused the Bunzl blades designated as models "M2–350," "M2–500," "M2–620," "M2–750," and "M2–850," and "any blade substantially similar in configuration thereto" of infringement. During the hearing, however, evidence of other models having a similar configuration was offered, without objection, expanding the list of accused models to include "M2–350," "LP–M2–440," "M2–500," "M2–505," "LP–M2–500," "M2–564," "M2–620," "LP–M2–620," "M2–625," "M2–750," and "M2–850" (PX 40).

On May 2, 2007, Bunzl was placed on notice of the 325 Patent by a letter from Bettcher's counsel to Patrick Larmon, President of Bunzl USA (PX 61). A subsequent letter of August 2, 2007, explicitly set out Bettcher's theory in this case that,

while the Bunzl replacement blades have an "arcuate" blade race as manufactured, the blades necessarily and quickly wear to an infringing "frustoconical" shape when used by customers (PX 54).

### Reexamination of the 325 Patent

On December 23, 2008, after Bettcher filed this action, Bunzl filed with the Patent Office a Request for *inter partes* Reexamination of the 325 Patent (Doc. No. 26). The Request was granted on March 26, 2009. The grant of the request was accompanied by an initial Office Action (Doc. No. 74–19).

Bunzl requested reexamination of the 325 Patent on four grounds:

- Claims 1–13 are unpatentable under 35 U.S.C. § 103(a) as being obvious over U.S. 4,854,046 ("Decker I") taken with U.S. 4,909,640 ("Nakanishi").

- Claims 1–13 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Decker I taken with Nakanishi and U.S. 1,374,968 ("Cooper").

- Claims 1–13 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Decker I taken with Nakanishi, Cooper and U.S. 5,419,619 ("Lew").

- Claims 1–7 are unpatentable under 35 U.S.C. § 102(b) as being anticipated by U.S. 5,099,721 ("Decker II").

In an initial Office Action, the Patent Office adopted the first three grounds in rejecting Claims 1–13 of the 375 Patent, but did not adopt Bunzl's argument that Decker II anticipated claims of the 325 Patent.

Bettcher responded to the initial Office Action, arguing that Claims 1 through 13 were patentable over the prior art. On November 19, 2009, the Patent Office issued an Office Action confirming Claims 1–13 of the 325 Patent, without amendment (Doc. No. 117).

The issues before the Patent Office are identical to those now before this Court and can be summarized by comparing the 325 Patent, to Decker I and to Nakanishi, as presented below:

**325 Patent**

**Decker I**

FIG. 6

**Nakanishi**

FIG. 1

Bunzl argues (as it did before the Patent Office) that the Decker I patent shows a rotating, annular blade having a bearing race that receives a blade support bearing structure of the housing. Nakanishi shows a rolling bearing arrangement utilizing spherical ball bearings that contact two frustoconical surfaces. Bunzl argues that it would be obvious to utilize the shape of the Nakanishi frustoconical surfaces as the bearing race for a Decker I-type annular blade when used with a housing like the one shown in the 325 Patent drawings. Cooper and Lew, the other two cited refer-

812

ences that were initially adopted and later rejected by the Patent Office, both utilize rolling bearing arrangements.

Bettcher replies (Doc. No. 89) that the bearing used with the 325 Patent blade is a sliding bearing. While the bearing depicted in the 325 Patent is semi-circular in cross-section, elsewhere in the specification it is depicted as a long, thin, rounded ridge that is a fixed element of the housing. Bettcher argues that the Nakanishi patent disclosed a ball bearing or rolling bearing structure, and that ball bearings function in a different way from sliding or journal bearings. Bettcher further argues that use of ball bearings in a knife as shown in the 325 Patent would create numerous problems, including the spherical balls falling out when the blade is removed from the blade housing for replacement, and the gap between the blade and the blade housing necessitated by spherical balls collecting meat product particles.

Bettcher argues that it would not have been obvious to one of ordinary skill in the art to modify Decker I to include two frustoconical bearing surfaces, in view of the teachings of Nakanishi. The Patent Office ultimately agreed with Bettcher's analysis (Doc. No. 117-1, pp. 14–16; emphasis in original; footnote omitted; typographical errors corrected):

> **Despite the fact that PO'S declarations and evidence are not sufficient to overcome the obviousness rejections, it is the examiner's position that it would not have been obvious to one of ordinary skill in the art to modify Decker I to include two frustoconical bearing surfaces, in view of the teachings of Nakanishi.** Examiner agrees with the PO that the teachings of Nakanishi would suggest to one of ordinary skill in the art to replace a sliding bearing structure with a roller bearing structure to provide the advantages (improved axial and radial support) taught

by Nakanishi, rather than to modify the sliding bearing structure to include a pair of frustoconical surfaces. PO submitted an excerpt from *Mark's Standard Handbook for Mechanical Engineers*:

> ROLLING FRICTION Rolling is substituted frequently for sliding friction, as in the case of wheels under vehicles, balls or rollers in bearings, rollers under skids when moving loads; frictional resistance to the rolling motion is substantially smaller than to sliding friction.

This excerpt is further evidence that one of ordinary skill in the art would most likely try replacing a sliding bearing structure with a rolling bearing structure. Furthermore, this indicates that "predictable results" would be had with the rolling bearing structure (frictional resistance to the rolling motion is substantially smaller than to sliding friction). Replacing the sliding arrangement with roller arrangement (PO shows such an arrangement on page 6 of the Remarks) would result in an undesirable device because a gap would be created between the lip 82 and the bearing groove 45, allowing debris and juices thereby inhibiting blade rotation.

As to 3PR's assertion that it would have been obvious to modify the bearing groove 45 in Decker to have a pair of frustoconical surfaces (and also modifying the shape of the lip 82 to arrive at a sliding bearing structure having only two lines of contact), Decker actually teaches away from doing so. First, the radial surface 91 does not act as a bearing surface. Decker discloses that the interaction between radial surface 91 and the lip keeps meat and juices from entering the housing and inhibiting rotation. Secondly, Decker states at column 7, lines 46–53:

> The close radial conformity to the blade groove and the essentially full

180 degree arcuate length of the shoe and the accompanying advantages of maximum bearing area of the shoe against the ... to minimize the size of the peripheral groove cavity 45. As to the latter advantage, *if the groove surface 91 were not radial and therefore not close to the housing lip and shoe to minimize the groove volume, it would collect juices and meat product particles during use* (emphasis added).

If proposed modification would render the prior art invention being modified unsatisfactory for its intended purpose, then there is no suggestion or motivation to make the proposed modification. *In re Gordon*, 733 F.2d 900, 221 U.S.P.Q. 1125 (Fed.Cir.1984). If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified, then the teachings of the references are not sufficient to render the claims *prima facie* obvious. *In re Ratti*, [46 C.C.P.A. 976] 270 F.2d 810, 123 U.S.P.Q. 349 (CCPA 1959). Modifying surface 91 to be frustoconical is [to] destroy the use of the surface. Accordingly, such a modification do[es] not render the claims *prima facie* obvious.

Regarding 3PR statements regarding intended use, it is the Examiner's position that the 3PR's arguments are incorrect. Examiner agrees that intended use recitations may not distinguish over the prior art. If a prior art structure is capable of performing the intended use as recited ... then it meets the claim. *In re Schreiber*, 128 F.3d 1473, 1477, 44 U.S.P.Q.2d 1429, 1431 (Fed.Cir.1997). However, when evaluating the prior art under 35 USC 103, the intended use of the structure must be taken into consideration to determine if modification of that structure is proper. In this case, propriety of the proposed modification (forming radial surface of Decker I as a frustoconical surface) has been discussed above.

The Examiner incorporated this same reasoning into his rejection of the obviousness arguments asserted by Bunzl as to the combinations involving the Cooper and Lew prior art. The difficulty of combining ball bearing art with the rotating blade design was also the subject of testimony by Whited at the preliminary injunction hearing, and he reached the same conclusion expressed by the Examiner (TR 230–33).

### The "1989 Design"

Bunzl also offered an earlier 1989 Bettcher blade as a claimed anticipatory reference. Bunzl argues that the "chamfers" depicted in the 1989 Design are two frustoconical surfaces that satisfy the bearing race limitations of Claim 1 of the 325 Patent. Whited testified about the difficulties a person of ordinary skill would encounter in utilizing the 1989 Design in a situation where the chamfers would act as bearing surfaces, noting that the chamfers are called out as being between 5/1000 and 15/1000 of an inch. He pointed out that "Because it's not a long surface, it would dig into your housing that you design in there very quickly ... I think it would lock up before it wears, knowing what I know about rotary knives" (TR 243). Whited also explained that a "chamfer" is "a broken edge to remove a sharp corner, normally put on to clear a surface on the mating part" (TR 261). When asked how a "typical engineer" would view a chamfer he testified (TR 261–62):

Q. Would a person—would a typical engineer looking at a mechanical drawing understand a chamfer to bear weight?

A. No, a chamfer is there to clear something or remove a sharp so as to prevent someone from getting cut on an edge.

Bunzl offered no evidence to the contrary, and, moreover, the Court finds Whited's testimony credible—that a person of ordinary skill in the art would not understand the indicated chamfers (DX 44) to be bearing surfaces.

### Testing of Bunzl Replacement Blades

The parties agree that Bunzl replacement blades are identical to the similarly numbered Bettcher blades, except that the bearing race—as sold by Bunzl—has a cross section that looks more like an arc, rather than having two "flat" bearing surfaces. Bettcher contends that when end-user customers of the Bunzl replacement blades use those blades in Bettcher Series II Knives, the arcuate blade race quickly and necessarily wears to two frustoconical surfaces (PX 41, 80).

Bettcher obtained numerous varieties of Bunzl replacement blades as actually used by Bettcher customers and had those replacement blades cut in two (cross-sectioned) and photographed at high magnification. One example of the Bettcher photographs is shown below, with the two flat surfaces as argued by Bettcher indicated by the arrowed lines (PX3, 22, 55, 59, 74, 76, 83; TR 74–149):

The details and tests of these various blades are summarized in the Declaration of Geoffrey Rapp submitted under seal with the Reply Brief (Doc. No. 81).

Bettcher's photographs were reviewed by its expert witness, Dr. Joseph Prahl, a Professor of Mechanical and Aerospace Engineering at Case Western Reserve University in Cleveland, Ohio. Prahl testified about the "flat" nature of the worn Bunzl blades and confirmed that every element of the 325 Patent Claim 1 is met by the used Bunzl replacement blades. He explained the mechanism by which the Bunzl blades necessarily wear to the patented configuration (Prahl Declaration, Doc. No. 36–3, ¶¶ 12–13; TR 172–260):

> The results of these tests confirm my opinion that, in operation, a semi-circular concave bearing race engaging the Bunzl semi-circular convex bearing surface will initially result in thin lines of contact, the hertzian contacts, at high pressures, the hertzian contact stresses, on either side of the bearing. The stress at the hertzian contact and the freedom of movement of the Bunzel [sic, "Bunzl"] bearing in the bearing race rapidly wears the semi-circular convex blade surface to a frustoconical bearing surface.

> I have compared the Bunzl rotating blades to the claims of the '325 Patent, and conclude that, upon operation for a short time in a rotary knife housing, the blades assume a shape that infringes at least claims 1, 6, 7 and 8 of the '325 Patent.

In response to questioning by this Court, Prahl further stated there are "no other options" other than deformation to frustoconical surfaces (TR 208):

> THE COURT: Tell me this: Based on your experience, what shape would these be expected to become after wear if not frustoconical? What are the other options?
>
> THE WITNESS: I know of no other options. Even though they started out—I think it's pretty clear that the shape started out as a nonfrustoconical surface. But it would wear to a frustoconical flat surface.

By contrast, Bunzl offered only one sample Bunzl replacement blade, used by a Bunzl customer, and provided this blade to expert William Macy who commissioned a third party professional to laser measure the dimensions of the blade race. Macy did a computational analysis of the dimension data, and concluded the blade race "lacks any straight line segments." He therefore opined the Bunzl replacement blades do not infringe the 325 Patent (DX 91; TR 322–62).

This Court heard the testimony, and reviewed the reports, of both Prahl and Macy, and finds a jury will likely conclude that Bunzl's replacement blades necessarily wear to a frustoconical shape when used by customers of Bettcher Series II Knives. The imaging relied on by Macy does not reveal a pattern materially different from that shown in the Bettcher images. Rather, Macy reaches his opinion by relying upon an unrealistically theoretical and exacting definition of "line segment." Prahl explained the difference between their positions in this way (TR 188–89):

> Well, mathematically a straight line has a radius of curvature which is infinite. What is infinite? That's a mathematical term that means it's not ten miles; it's not 100 light years. From a math standpoint, a pure mathematician would

say it's not straight because its radius of curvature is ten miles; therefore, it's a curve. But in engineering situations like this where the dimension of this race is, like, 1/16th of an inch, its radius of curvature as originally formed appears to be on the order of half that or on the order of 30/1000 of an inch. But if I find a surface in there that's flat and has a radius of curvature of ten miles, I'm going to treat that as flat because ten miles is so much bigger than 30/1000 of an inch. So within engineering certainty one can quibble about whether or not a line is a line and whether something is flat or not, but in reality when you look at the surface magnified this way and you see something that looks straight, then you put a ruler on it and you see that it really acts straight, at least over a certain region, then that's enough to make it within engineering certainty as straight.

This Court favors the realistic approach of Prahl who defined a line segment in practical engineering terms rather than as a matter of strict mathematical theory.

**Bunzl Blades' Impact on the Market**

Bettcher's President Don Esch testified that Bunzl's introduction of its replacement blades has led to a steep decrease in the average market price for the blades and has caused Bettcher to decrease the price of Bettcher replacement blades to keep up with Bunzl price reductions (TR 272–77). This finding is supported by internal correspondence between Bunzl's sales staff discussing Bunzl's strategy of lowering prices (PX 48–49).

Bettcher offered testimony that Bunzl's sale of replacement blades has led to a loss of customer goodwill because end-users are unable to distinguish easily between the Bettcher and Bunzl replacement blades (Rapp Declaration, ¶ 17; TR 277–79). However, this Court finds that testimony speculative, particularly since

Bettcher has responded to any customer complaints and used those opportunities to clarify the difference between Bunzl and Bettcher blades.

### PRELIMINARY INJUNCTION ANALYSIS

■ To grant a motion for a preliminary injunction, a court must consider four factors:

1. the likelihood of the patentee's success on the merits;
2. whether there would be irreparable harm if the injunction is not granted;
3. the balance of hardships between the parties; and
4. the impact of the injunction on the public interest.

*Erico Intern. Corp. v. Vutec Corp.*, 516 F.3d 1350, 1353–54 (Fed.Cir.2008). Though this Court should weigh each factor, "both case law and logic require that a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed.Cir.2001) (emphasis in original).

■ Regarding the first factor, Bettcher must show a likelihood that Bunzl's blades infringe a valid claim of their 325 patent. Likewise, Bunzl must show a "substantial question of invalidity" to defeat the injunction on grounds that the patent is invalid. *PHG Techs., LLC v. St. John Cos., Inc.*, 469 F.3d 1361, 1365 (Fed.Cir.2006). If Bunzl raises "a substantial question concerning either infringement or validity, . . . the preliminary

injunction should not issue." *Amazon.com*, 239 F.3d at 1350–51.

### Bettcher Has Demonstrated A Likelihood Of Success On The Merits Of Its Case

■ Bettcher claims (1) Bunzl actively induced customers to directly infringe in violation of 35 U.S.C. § 271(b); and (2) Bunzl contributed to direct infringement by customers in violation of 35 U.S.C. § 271(c).[2] A necessary element common to both the induced and contributory infringement claims is that the *users* of the Bunzl blades directly infringed Bettcher's patent. *See Cross Medical Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed.Cir.2005) (listing the elements of induced and contributory infringement). This Court will first address direct infringement by Bunzl blade users, then discuss the remaining elements of each claim.

### Direct Infringement by Users of the Bunzl Blades

■ An infringement analysis requires both claim interpretation and then comparison of the claims to the accused device or process. *Markman v. Westview Instruments*, 52 F.3d 967, 976 (Fed.Cir. 1995). After an exchange of briefs and a hearing, this Court adopted Bettcher's construction of "frustoconical" (Doc. No. 115, p. 2):

> Clearly, the ordinary meaning of "frustoconical" is not limited to right circular cones. This conclusion is supported by the patent specification, the prosecution history, and the dictionary

2. Bettcher claims induced and contributory infringement rather than direct infringement. To prove direct infringement of its 325 patent, Bettcher would have to show Bunzl "without authority makes, uses, offers to sell, or sells any patented invention during the term of the patent. . . ." 35 U.S.C. § 271(a). Bettcher has implicitly acknowledged that Bunzl blades, as sold, do not directly infringe its patent because Bunzl's blades, at least initially, have a shape distinguishable from a Bettcher blade (*see, e.g.*, Doc. No. 36–1, p. 8 ("[The Bunzl] bearing race or groove has a cross section that looks more like an arc, rather than having two 'flat' bearing surfaces.")).

definitions. This Court agrees with Plaintiff's position "that this patent is about engineering realities, not mathematical precision" and that the "ordinary meaning" of frustoconical applies to this patent. This Court adopts the more general definition offered by Bettcher.

In light of this construction, an analysis of the Bunzl Blades compared to Claim 1 of the 325 Patent reveals that every element of the claim is present in the Bunzl Blade. A comparison is facilitated by utilizing two annotated photographs of the accused Bunzl blade—the first a photomicrograph of the blade race region of a used Bunzl blade, the second a photograph of the entirety of a new Bunzl blade taken from a Bunzl product brochure:

**Exhibit**

Utilizing these two photographs and the annotated call-outs, the elements of Claim 1 of the 325 Patent can be found in the Bunzl blades as follows:

| CLAIM ELEMENT | WHERE FOUND IN BUNZL BLADE |
|---|---|
| 1. A rotary knife blade comprising: a rotatable annular body defining first and second axial ends, said body disposed about a central axis; and, | The accused Bunzl rotary knife blade includes a rotatable annular body A that defines a first axial (blade) end B and a second axial (nonblade) end C. The annular body A is disposed about a central axis D. |
| an annular blade section rotatable with the annular body and projecting axially from the first axial end of said body; | The accused Bunzl Blade includes an annular blade section E at the first axial end B. The annular blade section E is integral with and rotates with the annular body A. The annular blade section E projects axially from the first axial (blade) end B. |
| said body comprised of a wall defining a radially outer surface disposed between said first and second axial ends, and an annular bearing race in said surface and extending radially into said wall, | The annular body A of the accused Bunzl Blade includes a wall F defining a radially outer surface G disposed between the first axial (blade) end B and the second axial (nonblade) end C. The accused Bunzl Blade includes an annular bearing race H in the radially outer surface G that extends radially into the wall F. |
| said bearing race spaced axially from said blade section and comprising a first surface that converges proceeding away from said second axial end, and a second surface that converges proceeding toward said first surface, said first and second surfaces defining first and second bearing faces spaced axially apart, | The annular bearing race H of the accused Bunzl Blade is spaced axially from the blade section E and includes a first surface I that converges proceeding away from the second axial (non-blade) end and a second surface J that converges proceeding toward the first surface I. In the accused Bunzl Blade, the first surface I and the second surfaces J define first and second bearing faces that are spaced axially apart. |
| wherein both of said bearing faces are frustoconical. | When the accused Bunzl Blade is used in a Bettcher Series II rotary knife blade housing, the first and second bearing faces wear to a frustoconical configuration, per the evidence shown in the Rapp Declaration [ECF 36–3] and Rapp's testimony at the hearing, and the opinions reached in the Prahl Declaration [ECF 36–4] and Dr. Prahl's testimony at the hearing. |

The only claim element disputed by the parties is whether the bearing face of Bunzl's replacement blades wear during customer use of the blades into a shape that is "frustoconical." As discussed above, this Court finds it likely that a jury would so conclude. Thus, Bettcher has established a likelihood of direct infringement by Bunzl's customers.

*Induced Infringement by Bunzl*

35 U.S.C. § 271(b) provides: "Whoever actively induces infringement of a patent shall be liable as an infringer." Active inducement requires "that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Minn. Mining & Mfg. Co. v. Chemque, Inc.,* 303 F.3d 1294, 1304–05 (Fed.Cir.2002)

(citations omitted). Specifically, inducement requires knowledge of the asserted patent and "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med. Corp. v. JMS Comp.,* 471 F.3d 1293, 1304, 1306 (Fed.Cir.2006) (en banc in relevant part). "The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Id.*

There is no dispute that Bunzl was on notice since 2007 of Bettcher's position that the replacement blades would wear to an infringing shape. In marketing the blades specifically as replacements for existing Bettcher blades in Bettcher Series II Knives, Bunzl actively encouraged customers to use the blades in an infringing manner.

*Contributory Infringement by Bunzl*

35 U.S.C. § 271(c) provides, "[w]hoever offers to sell or sells within the United States ... a component of a patented machine, manufacture, combination or composition, ... constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

Bunzl does not challenge that it sells replacement blades with the knowledge and intent that its customers use the blades in Bettcher Series II Knives. Rather, Bunzl asserts that Bettcher's allegations must fail because Bettcher (i) cannot prove direct infringement, a prerequisite to secondary liability, and (ii) cannot show that Bunzl's replacement blades have no substantial non-infringing uses. *See Cross Medical Products, Inc. v. Medtronic*

*Sofamor Danek, Inc.,* 424 F.3d 1293, 1312 (Fed.Cir.2005).

For the reasons stated above, this Court finds it likely that Bettcher will succeed in showing direct infringement of its 325 Patent by end-customers of the Bunzl replacement blades. The Court also finds no evidence of an alternate use for the blades other than in a fashion that wears to the claimed shape. The sole potential non-infringing use raised by Bunzl is that the blades may be used for a short period of time prior to the blade race wearing into an infringing frustoconical shape. However, under the Federal Circuit's requirement of commercial viability, a non-infringing use must be reasonable. *See Glass Equipment Development, Inc. v. Besten, Inc.,* 174 F.3d 1337, 1343 (Fed.Cir. 1999). Customers would not reasonably use a blade for only a few moments and then discard it. Rather, customers use a blade until the end of the blade's serviceable life—which can range from a few hours to a few days.

Because Bunzl fails to offer any evidence of a commercially reasonable non-infringing use, this Court finds that Bettcher is likely to succeed in showing that Bunzl contributes to and induces infringement of the Bettcher 325 Patent through Bunzl's sales of replacement blades.

*Validity of the 325 Patent*

A patent owner seeking a preliminary injunction is required to present a clear case supporting the validity of the patent in suit. *See Nutrition 21 v. United States,* 930 F.2d 867, 871 (Fed.Cir. 1991). One way to establish a "clear case" is showing that the patent in suit has successfully withstood previous validity challenges in other proceedings. *Amazon.com,* 239 F.3d at 1359. Further support for a "clear case" can come from a long period of industry acquiescence in the patent's validity. *See* 7 Donald S.

Chisum, CHISUM ON PATENTS § 20.04[1][c], at 20–673 to 20–693 (1998) (citing cases).

The 325 Patent has successfully withstood validity challenges in another proceeding. Bunzl sought a reexamination of the 325 Patent claims based on what it presumably found to be the most persuasive art available. As detailed above, the Patent Office issued an Office Action wholly rejecting Bunzl's arguments, confirming Claims 1–13 of the 325 Patent without amendment. This Court finds persuasive the Examiner's detailed statement of reasons for finding the 325 Patent valid in light of the art asserted by Bunzl. Therefore, this Court finds it likely that Bettcher will be successful after a full hearing on the merits in defeating Bunzl's charges of invalidity.

Bettcher also offers evidence of "industry's acquiescence" in the validity of the 325 Patent from its settlement with another competitor, Hantover, Inc., in 2007. In 2006, Bettcher filed an action before this Court [Case No. 3:06–CV–741] for infringement of the 325 Patent against Hantover relating to Hantover's sale of replacement blades for the Bettcher Series II Knives. The primary design at issue in that case was a replacement blade that included a semicircular or arcuate bearing race design very much like that offered by Bunzl. After substantial litigation, the matter was settled in an agreement that included Hantover's promise not to make, use, or sell the replacement blade.

As to Bunzl's remaining argument that the 1989 Bettcher blade design anticipated Claim 1 of the 325 patent, this Court finds it likely that the 1989 Design lacks the necessary claim element of "said bearing faces [which] are frustoconical." The structures identified by Bunzl as supplying that element were demonstrated by Whited to be insufficient for the purpose of serving as bearing faces. Furthermore, the drawing depicting those structures identified them as "chamfers" which have the opposite use of a bearing face. The chamfers in the 1989 Design do not inherently possess the ability to act or function as bearing surfaces; rather, they provide non-bearing functions, e.g., providing clearance or removing a sharp edge. Lacking the critical element of a frustoconical bearing face, the 1989 Bettcher blade design cannot anticipate Claim 1 pursuant to 35 U.S.C. § 102.[3]

**Bettcher Has Not Demonstrated Irreparable Harm**

Historically, patent holders who made a strong showing of likelihood of success on the merits were entitled to a rebuttable presumption of irreparable harm for preliminary injunction purposes. See, e.g., Amazon.com, 239 F.3d at 1350. However, in eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), the Supreme Court overruled the Federal Circuit's "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances." Id. at 391, 126 S.Ct. 1837 (emphasis added). The Court explained that district courts must exercise their discretion "consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." Id. at 394, 126 S.Ct. 1837.

The Federal Circuit has not yet addressed whether eBay's holding applies

---

**3.** Bunzl also argues that Bettcher's failure to apprise the Patent Office of the 1989 Design was an act of inequitable conduct, rendering the 325 Patent unenforceable. Further, Bunzl submitted no evidence to suggest that the failure by Bettcher to cite the 1989 Design to the Patent Office was an act of intentional deceit. See Larson Mfg. Co. of S.D. v. Aluminart Prods., 559 F.3d 1317, 1327 (Fed.Cir. 2009) (" '[I]nequitable conduct requires not intent to withhold, but rather intent to deceive.' ") (citations omitted).

to *preliminary* injunctions in patent cases. See *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383, n. 9 (Fed.Cir.2006) (declining to address the argument that a presumption of irreparable harm for preliminary injunctions is forbidden by *eBay* ). However, most district courts that have confronted the issue have held that *eBay* eliminated the presumption of irreparable harm at the preliminary injunction stage. *See, e.g., Bushnell, Inc. v. Brunton Co.*, 673 F.Supp.2d 1241, 1260–61 (D.Kan.2009) (collecting cases); *but see Christiana Indus. v. Empire Elecs.*, 443 F.Supp.2d 870, 884 (E.D.Mich.2006) (*eBay* did not eliminate presumption). This Court agrees with those cases concluding there is no such presumption. The language of *eBay* is quite broad—discretion to grant injunctions in patent cases "must be exercised consistent with traditional principles of equity," 547 U.S. at 391, 126 S.Ct. 1837—and its reasoning applies with equal force to preliminary injunctions. Therefore, a categorical presumption of irreparable harm is inappropriate, even when there is a likelihood of success on the merits.

▮ Absent a presumption, then, the burden remains on Bettcher to demonstrate that it will suffer irreparable harm if a preliminary injunction does not issue. Bettcher claims irreparable harm in the form of lost sales, price erosion, and loss of customer goodwill resulting from Bunzl's alleged infringement. However, this Court concludes that none of these claimed injuries rise to the level of irreparable harm.

▮ An infringing product's impact on sales and price do not automatically establish irreparable harm. *Abbott Laboratories v. Andrx Pharm.*, 452 F.3d 1331, 1347–48 (Fed.Cir.2006) ("[A]s to Abbott's economic arguments, we do not doubt that generic competition will impact Abbott's sales of [the patented drug], but that alone does not establish that Abbott's harm will

be irreparable."); *see also Novartis Pharm. Corp. v. Teva Pharm. USA, Inc.*, 2007 WL 2669338, at *14 (D.N.J.2007) ("Both loss of market share and price erosion are economic harms and are compensable by money damages."). Bettcher cites *Sanofi–Synthelabo* as an example of irreparable harm based on price erosion, but that case involved "irreversible" price erosion due to complex health insurance pricing schemes that were outside the control of the parties. 470 F.3d at 1382–83. There is no complex pricing scheme here; rather, prices appear to be dictated largely by competition between the two parties. Bettcher's president testified about specific pricing actions taken by Bunzl, as well as Bettcher's pricing decisions in response (TR 274–76). Accordingly, the past and future economic harm to Bettcher resulting from Bunzl's alleged infringement should be readily calculable and compensable by money damages.

As to potential loss of customer goodwill, this Court finds that this claimed harm is speculative at this point in time. Although Bettcher's president testified about instances of customer complaints to Bettcher related to the performance of Bunzl blades (TR 278–79), such evidence was slight. The number and frequency of such complaints does not suggest that Bettcher's goodwill will be permanently damaged. Moreover, Bettcher has responded to each complaint and explained to the customers that the blades were not manufactured by Bettcher (TR 279). Thus, the potential for permanent customer confusion and loss of goodwill is minimal (particularly since trial is only four months away), and it does not equate with irreparable harm for purposes of a preliminary injunction.

▮ Bunzl also argues the timing of Bettcher's request for injunctive relief— more than two years after it learned Bunzl was offering replacement blades for sale—

weighs against finding irreparable harm. Although a delay can cut against finding irreparable harm, *see High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (1995), Bettcher offers a reasonable explanation for its delay here. First, Bettcher contends it waited to request an injunction until testing of Bunzl's blades had confirmed its theory of liability. This was prudent. Second, Bettcher notes the sale of Bunzl blades did not take off until early 2008, after Bunzl undercut Bettcher's prices. In these circumstances, the timing of Bettcher's request for injunctive relief was reasonable, and the delay does not factor into this Court's analysis of irreparable harm.

Nonetheless, there has been no showing that Bettcher's lost sales cannot be adequately compensated by money damages. It is not the length of time that dictates this finding, but rather that the harm in this case is calculable. Past lost profits and future lost profits can be determined and awarded.

### Conclusion

Because Bettcher has not established irreparable harm, this Court need not address the other preliminary injunction factors. A finding of irreparable harm is necessary before granting a preliminary injunction. Therefore, even though Bettcher has established a likelihood of success on the merits, it is not entitled to a preliminary injunction. *See, e.g., Cordis Corp. v. Boston Scientific Corp.*, 99 Fed. Appx. 928, 933–34 (Fed.Cir.2004) (holding that patentee was not entitled to a preliminary injunction because there was no showing of irreparable harm, notwithstanding showing of likelihood of success on the merits); *Rosemount, Inc. v. U.S. Int'l Trade Comm'n*, 910 F.2d 819, 821–22 (Fed.Cir.1990) (same).

Accordingly, Bettcher's Motion for Preliminary Injunction (Doc. No. 36) is denied.

IT IS SO ORDERED.